**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| METROPOLITAN BREWING, LLC, | ) Case No. 23-13209 |
| | ) |
| Debtor. | ) Honorable Deborah L. Thorne |
| | ) |

**DECLARATION OF TRACY HURST IN SUPPORT OF**
**FIRST-DAY MOTIONS AND APPLICATIONS**

I, Tracy Hurst, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the President of Metropolitan Brewing, LLC (the "*Debtor*").  I am familiar with the Debtor's day-to-day operations, business affairs, and books and records.

2.      On October 3, 2023 (the "*Petition Date*"), the Debtor filed a voluntary petition for relief under subchapter V of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Northern District of Illinois (the "*Bankruptcy Court*"), thereby commencing the above-captioned bankruptcy case (this "*Chapter 11 Case*").  In order to minimize the adverse effects of the chapter 11 filing, the Debtor has requested various types of relief in "first day" motions and applications (collectively, the "*First Day Motions*") that are being filed with the Court.

3.      I am submitting this declaration (the "*Declaration*") in support of the Debtor's chapter 11 petition and First Day Motions in the above-captioned case.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my review of public and nonpublic documents, or my opinion, based on my experience and knowledge of the beer industry, and the Debtor's operations and financial condition.  If called upon to testify, I could and would testify competently to the statements set forth herein.

4.     Part I of this Declaration describes the Debtor's business and the circumstances surrounding the commencement of this Chapter 11 Case.   In Part II of this Declaration, I substantiate the truth and accuracy of the relevant facts set forth in the First Day Motions filed concurrently herewith.

## BACKGROUND

### A.  The Debtor's Businesses

5.     Metropolitan is a well-known and well-loved brewery located in a large commercial property (the "*Property*") overlooking the North Branch of the Chicago River at 3057 N. Rockwell Street. I founded the brewery with Doug Hurst in 2007. The brewery focuses on brewing German-style beers including well-known brands such as its "Krankshaft Kölsch" and "Flywheel Pilsner."

6.     The Debtor leases its space (the "*Brewery Space*") from Rockwell Properties, LLC (the "*Landlord*"). The Brewery Space is generally comprised of: (a) a unique taproom with floor to ceiling windows and a large deck overlooking the river and (b) an adjacent production facility where the beer is brewed and stored pending distribution. Below the deck in the river there are a series of docks where brewery customers can rent electric boats to explore the river, and where boat owners can tie-up to visit the brewery or otherwise explore the premises. Along the walkway leading to the brewery is a barbecue restaurant where brewery customers can order food (along with several other businesses that rely on the foot-traffic generated by the taproom).

7.     In 2022, the brewery generated gross revenue of approximately $2,156,123, and 2023 projects to be similar. The Debtor generates revenue from distribution (selling kegs and cans), sales in its taproom, and it also "contract brews" (produces beer for) one smaller historical Chicago-based brewery.

8.     Doug and I, the two founders, remain full-time employees. Doug is Metropolitan's head brewer, and I am President and self-titled "Image Mistress" (in charge of everything from

overseeing the finances to the brewery's social media and marketing campaigns). Including the two of us, the Debtor employed a total of 22 people as of the Petition Date. Eight are full-time employees (*e.g.*, a comptroller, cellar manager, taproom general manager, etc.). Full-time employees are paid in advance (so there should be no pre-petition amounts owed to these employees). The others are part-time employees who work in the Debtor's taproom. These employees are paid two weeks in arrears and were last paid on September 29, 2023. As of the Petition Date I estimate that ***total*** pre-petition wages owed to employees is less than $10,000. As discussed below, I understand that the Debtor is filing a "first day" motion to make sure it can pay these employees in the ordinary course (including for pre-petition amounts owed).

9.      In addition to their bi-weekly payroll, the part-time employees in the Debtor's taproom also receive (and primarily rely on) pooled tip revenue. The Debtor tracks the amount of tips paid by customers (both in cash and by credit card), collects the tip money for the benefit of the eligible employees, and each night a manager pays out the nightly tip revenue to the Debtor's employees in cash (either with cash on hand or, if insufficient – because most tips are paid on credit card – cash from the Debtor's operating account). As the tip revenue is not an asset of the Debtor, and the Debtor will not owe any pre-petition tip revenue to employees as of the Petition Date, the Debtor will be continuing to collect and pass through tip revenue in the ordinary course of business each day post-petition. Not doing so would almost certainly have dire consequences for the business, as the part-time employees rely on their nightly tip revenue to get by.

10.     The Company also pays for individual healthcare coverage for its full-time employees (less a $25 per paycheck contribution from most participating employees) and matches IRA contributions up to 3% pre-tax. The Debtor was generally current on its obligations with respect to these benefit programs and I do not believe that material amounts are owed as of the

Petition Date (certainly nothing outside of ordinary course obligations). The Debtor is requesting authority to continue all benefit programs, including paying pre-petition amounts owed, to the extent applicable, in the ordinary course of business.

**B.      The Debtor's Assets**

11.      As of the Petition Date, the Debtor's primary assets generally consisted of the following (values here are from the recent appraisal attached as <u>Exhibit A</u> or in the case of accounts receivable and cash, from October 2, 2023, just before the Petition Date):

| Asset | Estimated Liquidation Value | Description |
|---|---|---|
| Machinery & Equipment | $720,600 | *See* appraisal attached hereto as Exhibit A |
| Furniture & Fixtures | $6,500 | *See* appraisal attached hereto as Exhibit A |
| Company Vehicle | $8,428 | |
| Accounts Receivable | $10,154 | Largely distribution (non-taproom) sales |
| Cash – Operating | $27,218 | |
| Cash – Money Market | $63,755 | |
| Inventory | $0 | TBD, the Debtor's beer inventory only has any value in a going-concern scenario. |
| **Total** | **$836,655** | |

12.      **The Debtor's Prepetition Capital Structure**

13.      The Debtor's senior secured lender is Live Oak Banking Company ("*Live Oak*"), which issued a United States Small Business Administration ("*SBA*") loan to the Debtor on November 12, 2015. The Debtor understands that Live Oak asserts that it was owed approximately $1,005,418 as of October 2, 2023 and asserts a security interest in substantially all of the Debtor's assets to secure the obligations.

14.      My understanding, however, including based on information provided by our professionals, is that Live Oak (a) is not in first position on certain of the Debtor's assets and (b) does not have a perfected lien on other assets. For example:

- PNC (defined below) appears to have a first position purchase money security interest on and be under-secured with respect to the Debtor's $165,000 Canning Line Assets (defined below). The Canning Line assets are part of the "Machinery & Equipment" value above, so for $165,000 of the $720,600 in Machinery & Equipment, it appears Live Oak is in second position;

- Live Oak is not listed on the title for the company vehicle (and thus would not have a perfected lien on same);

- Only cash in the Debtor's operating account could have been generated from the sale of inventory within 20 days of the Petition Date (Live Oak does not have an account control agreement that I am aware of, and the Debtor's accounts are at PNC, not at Live Oak). The funds in the money market account have been in that account for many months, and are primarily the proceeds of employee retention credits received by the Debtor. Accordingly, the Debtor understands that to the extent Live Oak has a lien on cash as a result of it being proceeds of its collateral, the lien would be limited to the amount of cash in the operating account as of the Petition Date (at the most).

Based on the foregoing, my understanding is that the maximum value of the collateral Live Oak could have a first-priority lien on would be approximately $599,472 (making Live Oak substantially under-secured).[1]

15.    The SBA issued an Economic Impact Disaster Loan ("*EIDL Loan*") to the Debtor on May 22, 2020. The balance as of the Petition Date was approximately $386,454 and to my understanding the SBA asserts a second-priority security interest in the same collateral as Live Oak (subject to the same issues as noted above). As the value of Live Oak's claim materially exceeds the value of the collateral securing it, my understanding is that the EIDL Loan is functionally unsecured.

---

[1]    The statements herein (regarding this claim or others) should not be construed as an admission regarding the validity of any claim or regarding the scope, priority, or perfection of associated liens. Investigation continues, and the Debtor reserves the right to object to any claim. The statements herein are based on the Debtor's preliminary understanding, provided to give parties-in-interest the best possible insight into the situation.

16.     PNC Bank, National Association ("*PNC*") issued an equipment loan to the Debtor on March 13, 2023 (the "*PNC Equipment Loan*") to help the Debtor purchase a canning line and related assets (the "*Canning Line Assets*"). I understand that PNC asserts that the Debtor owes approximately $181,258 on the PNC Equipment Loan as of the Petition Date and appears to assert a first position purchase money security interest (the "*PNC PMSI*") in the Canning Line Assets. The value of the Canning Line Assets was approximately $165,000 as of the Petition Date (*see* appraisal attached as <u>Exhibit A</u>).

17.     As of the Petition Date, the Debtor also owed approximately $58,500 in aggregate unsecured debt to trade creditors and $29,758 on an unsecured line of credit with PNC.

18.     Finally, the Landlord claims that it is owed over $1 million in back rent and other amounts under the Lease (defined below). This claim is disputed, and as discussed below, is the subject of litigation that in part resulted in the filing. Notwithstanding this dispute, as discussed below, the Debtor's goal is to work with the Landlord to get the best possible result for it and other creditors.

**C.  Reasons For Chapter 11 Filings**

19.     Operationally, I generally believe the Debtor is performing well. It has a solid brand and following and has been successfully operating in its present location since mid-2017 (following several years of construction on the space). Gross revenue in 2022 was solid ($2,156,123) and revenue in 2023 may surpass that slightly.

20.     Unfortunately, however, the brewery has been struggling with three interconnected issues that together largely resulted in the bankruptcy filing.

### 1.     Disappointing Distribution Results

21.     Although the Debtor's tap room sales have generally been stable or increasing year over year (putting aside the pandemic), distribution numbers have often been decreasing. I believe

this is consistent with broader trends in the beer industry. My understanding is that many of our peers are experiencing similar issues resulting from, among other things, intense competition for shelf space and increasing competition from alternative beverages (*e.g.*, alcoholic seltzers).

### 2.     The Lease Dispute & Back Rent Claim

22.     Prior to Metropolitan becoming a tenant the Brewery Space was vacant. Following negotiations, a lease was signed on October 7, 2015, and the Landlord built out the space. Metropolitan invested approximately $955,000.00 of its own funds as well.

23.     The parties and their attorneys exchanged many drafts of the Lease, and work on the space commenced before the lease weas finalized. The initial draft of the lease, and all drafts and revisions thereof that were exchanged up through the day before execution, included a square footage for the Premises that was less than 25,000. Square footage was important, because the amount of rent is calculated based on same.

24.     On October 7, 2015, with lease negotiations nearing completion, Doug and I were at the Premises working on improvements (the space was still incomplete). The Landlord's representative arrived at the property and personally presented us with a single copy of the Lease for signature. This version of the Lease listed the Brewery Space at 33,094 square feet.

25.     The Landlord had already signed the single copy of the Lease. We were told that (a) the Lease included the current and most recent terms as agreed by the attorneys and (b) Metropolitan needed to sign the Lease right away so Landlord could obtain licenses or permits.

26.     We had no time to review the Lease or confer with our counsel. But we understood from Landlord that no detailed review was necessary. This was in part because the Landlord had previously prepared and presented a letter – which was drafted and formatted to look as if Metropolitan had written and prepared it – stating that the executed Lease was still subject to

modification (including with respect to square footage). The letter provided that if agreement could not be reached by November 30, 2015, then either party could terminate the Lease.

27.    Doug signed the Lease and the Letter on October 7, 2015.

28.    On November 30, 2015 – the date for terminating under the letter – the Brewery Space was still under construction. We unfortunately did not terminate the Lease.

29.    In fact, construction took a long time. The outdoor patio space was not completed until September 2019. In May 2020, with the Brewery Space finally complete, we hired an architect, AltusWorks, to measure the space. The survey showed that the Brewery Space is 20,492 square feet indoors, and the patio 1,669 – far less than the 33,094 square feet in the Lease.

30.    The foregoing has resulted in an unfortunate and protracted dispute.

31.    We felt misled and felt that the Debtor was over-paying. In the fourth quarter of 2019, we were advised by our CPA at the time to stop paying rent until the overpayment had been repaid to us. A few months later, the pandemic forced us to temporarily shut down the Debtor. The Debtor paid no rent in 2020 until October, when it paid a lump sum of $50,000 from PPP funds. Approximately thirty days later, The Landlord sent the Debtor an eviction notice. Litigation commenced, and has proceeded for several years, with the Debtor ultimately paying monthly "use and occupancy" rent that is below the full amount provided for in the Lease but close to what I believe is "market" for the space. The Landlord now claims that it is owed over $1 million in back rent, costs, and other damages (I am not sure of the exact amount currently claimed).

32.    I am not providing the foregoing history because the Debtor intends or desires to rehash these issues in this bankruptcy case, or even to cast the Landlord in a bad light. I am only providing this background to explain to the Court and other parties how the Debtor and Landlord arrived at this point.

33.    To the contrary, the bankruptcy is being filed because while the Debtor *can pay market rent for the Brewery Space going forward* (assuming its capital structure is rationalized as proposed herein) there is no way the Debtor can ever re-pay the amount of back rent the Landlord is seeking. A shut-down was imminent absent a restructuring or sale. As discussed below, I believe that would be disastrous for all parties, and I am hoping the collective forum of a bankruptcy can accomplish a better outcome.

### 3.    Unsustainable Debt Level

34.    Last, but certainly not least, the brewery's debt level is unsustainable. As discussed above, the Debtor owes its lenders materially more than the liquidation value of the collateral. It cannot sustain that debt load while also paying market rent for the Brewery Space and operating profitably.

## D.    Plan – Maximizing Stakeholder Outcomes

35.    One thing I am confident in is that the brewery shutting down would be a disastrous outcome:

- **Creditors:** assets would be liquidated. As discussed above, Live Oak and PNC would receive partial recoveries on their secured claims. All other creditors, including the SBA on the EIDL Loan, would receive no recovery after liquidation costs. To my understanding there is a lot of used brewery equipment on the market now, and it is not a good time to be liquidating.

- **Landlord:** the Brewery Space would go dark. The Landlord would stop receiving rent (as compared to now, where it is getting use and occupancy rent that is close to market). It would have to find another tenant, presumably provide incentives like free rent, and will have to spend tenant improvement dollars to improve the space. Moreover, the other tenants in the building – like the electric boat rental business and barbecue business – will suffer and could fail from the reduced foot traffic.

- **Equity holders:** over fifteen years of work would be thrown out the window. All investors will lose their chance at ever seeing a recovery. The community will lose an institution. Although Doug and I are prepared to move on if it turns out to be in the best interests of creditors, all of this is incredibly painful.

36.     In an effort to avoid the foregoing outcome – or at least provide a chance for it to be avoided, we filed the bankruptcy case, and will be proposing a plan as quickly as possible, that is contemplated to provide creditors with alternatives:

37.     **Reorganization:** we have proposed a lease amendment to the Landlord which contemplates the Debtor paying market (increased) rent and an extension of the lease option term (to give investors a chance to benefit from the business after making Plan payments). Equipment lenders will get new notes for more than liquidation value (but less than the current debt load), and unsecured creditors (including the Landlord's claim and deficiency claims) will receive a partial recovery. We will be sharing projections to show that this is feasible and consistent with past performance in recent years. We recognize that this would require a deal with the Landlord, but this should be doable. Metropolitan is fundamentally a good tenant: it has been an anchor tenant in the space, and with the restructuring, will be able to pay market rent going forward.

38.     **Sale:** we are not wedded to the reorganization -- there may be a better alternative for creditors. For example, perhaps another brewery is interested in taking over the space and would be willing to work out a better deal with the Landlord and pay more to and / or assume more of the equipment debt. We are open to alternatives. Even prior to the bankruptcy we understand that the Landlord had been working to find a buyer, and we are fine with the Landlord bringing parties to the table and being involved in the process. Effectively, our reorganization proposal will serve as a "stalking horse" bid.

39.     **Liquidation:** the brewery will not be able to make it through the winter (the slow season) without a comprehensive restructuring or sale. If no deal has been reached by confirmation, the Plan will provide for an efficient closure and liquidation. We hope this can be avoided for the reasons we have explained.

## FIRST DAY MOTIONS AND APPLICATIONS

40.     Concurrently with the filing of the Chapter 11 Case, the Debtor is filing certain applications, motions, and proposed orders.  The Debtor requests that the relief described below be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtor for the benefit of all parties in interest.

41.     I have reviewed and discussed with the Debtor's counsel each of the First Day Motions filed contemporaneously herewith (including the exhibits thereto and supporting memoranda) and incorporate by reference any factual statements set forth in the First Day Motions. It is my belief that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtor's ability to achieve the goals of this Chapter 11 Case.

**A. Debtor's Motion for Entry of Interim and Final Orders *Nunc Pro Tunc* to the Petition Date Authorizing (I) Continued Maintenance of Existing Cash Management System and Bank Accounts; (II) Use of Existing Forms; and (III) Granting Related Relief (the "*Cash Management Motion*")**

42.     By the Cash Management Motion, the Debtor seeks to maintain its streamlined cash management system that consists of a checking account (the "*Operating Account*") and a money market / savings account (the "*MM Account*," and together with the Operating Account, the "*Bank Accounts*").  The Bank Accounts both are located at PNC Bank, N.A. (the "*Bank*").

43.     The Debtor uses the Operating Account as the primary account in which the Debtor collects and disburses cash generated by its business, satisfies financial obligations, funds payroll, and centrally controls and monitors funds and available cash.  All deposits flow through the Operating Account and expenditures are generally paid out of the Operating Account.  The MM Account is used by the Debtor as a savings account and effectively as an internal line of credit. When excess cash builds up in the Operating Account, the Debtor transfers cash to the MM

Account, both for security and to collect interest. When cash is short in the Operating Account, the Debtor transfers funds from the MM Account. The Debtor's integrated use of its Bank Accounts to collect cash and satisfy its financial obligations comprise its "Cash Management System."

44.     I believe it will be beneficial for the Debtor, its reorganization prospects, and creditors if the Cash Management System can remain intact during the Chapter 11 Case. Leaving the Cash Management system in place will allow me and the Debtor's limited staff to focus on generating revenue and maintaining operations as seamlessly as possible.  If the Debtor is required to alter the manner in which it collects and disburses cash, including changing bank accounts, the Debtor would have to overextend its scarce human resources. This is in large part because there are many vendors and employees who are set up to be paid electronically, so all of the Bank Account infrastructure would have to be re-created, which would take significant time.

45.     The Debtor also collects some of its receivables electronically. I believe that requiring the Debtor to switch bank accounts will create confusion and potentially result in delayed revenue. Keeping it in place would avoid this risk. Similarly, the Debtor is set up to fund payroll – which it does via ACH transfers – through the PNC operating account. Requiring the Debtor to open a new bank account could disrupt payroll, which I think is the last thing the Debtor needs as it is trying to stabilize operations in Chapter 11 and reassure employees.

46.     I also believe that the PNC equipment loan note requires the Debtor to maintain its primary depository accounts at PNC (or PNC has the right to increase the interest rate by 1% and reserves the right to exercise other remedies).

47.     Finally, I am informed by my counsel that they believe the Bank is an "approved depository institution" with the United States Trustee's office.

48.     Based on the foregoing, I submit that the relief requested by the Cash Management

Motion is necessary and appropriate, is in the best interest of the estate and creditors, and thus

should be granted by this Court.

**B.  Motion Pursuant to Sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rule 4001 for Interim and Final Orders: (1) Authorizing the Use of Cash Collateral; (2) Scheduling Final Hearing; and (3) For Related Relief (the "*Cash Collateral Motion*")**

49.     By the Cash Collateral Motion, the Debtor principally requests the Bankruptcy

Court's authority to use the cash collateral in order to fund certain expenses outlined in the Budget

(attached to the Cash Collateral Motion, the "*Budget*").

50.     As of the date hereof, the Debtor does not have sufficient unencumbered cash, and

thus, it needs liquidity to operate its business.  If the Debtor is unable to fund payroll, it will lose

employees which, in turn, will likely result in the shutdown of the Debtor's business operations.

51.     To avoid such a drastic result, the Debtor seeks to use cash collateral in order to

timely fund payroll and other critical operating expenses.  In consideration, the Debtor has agreed

to provide Live Oak and PNC – the two lenders that appear to have secured positions in certain of

the Debtor's assets – with adequate protection in the form of replacement liens and a new lien on

the Debtor's money market account.

52.     I believe that inability to use the Cash Collateral on an expedited basis will likely

result in an immediate cessation of the ongoing operations of the Debtor's business and will cause

irreparable harm to the Debtor's estate. To the contrary, I believe that creditors – including Live

Oak, PNC, and the EIDL – will come out economically better if the Debtor is able to continue to

operate while it pursues its Restructuring.

53.     Continuing to operate through the use of Cash Collateral will allow the Debtor to

maintain the collateral of each lender and, most importantly, will allow the Debtor to continue to

operate – which ultimately should result in a better Restructuring outcome. This is particularly true

given that it is my understanding that this is not a good time to liquidate brewery assets. If the Debtor shuts down, even achieving the numbers contained in the Appraisal may be difficult or impossible in my opinion.

54.     The Debtor has an urgent and immediate need to use Cash Collateral to continue its business operations while it pursues the Restructuring.   The Debtor's business will be immediately and irreparably harmed without authorization from the Court to use Cash Collateral, as requested, on an interim basis pending the final hearing.

55.     Based on the foregoing, I additionally submit that the Cash Collateral Motion is in the best interests of the Debtor, the estate, creditors, and other parties in interest, and should be granted in the Chapter 11 Case as requested therein.

**C.      Emergency Motion for Entry of an Order (A) Authorizing the Debtor to Pay and Honor Priority Pre-Petition Wages, Benefits, and Obligations (and to Continue Same, and Make Ordinary Course Deductions from Employee Paychecks, Post-Petition); and (B) Approving Related Relief (the "*Wage Motion*")**

56.     By the Wage Motion, the Debtor seeks authority to continue paying employee wages and providing benefits, including paying all associated pre-petition amounts.

57.     The Debtor's employees, as well as their compensation and benefit programs, are described above.

58.     The employees, especially the part-time employees, rely on their week-to-week earnings. For the Debtor to continue its business operations in bankruptcy, the continuing employment and contribution from these employees is critical. I believe that if these employees are not paid, they will likely and promptly seek employment elsewhere. This would, in my opinion, cause irreparable harm to the Debtor and to its ability to file and effectuate a plan and maximize value for its creditors.

59.     I believe that the Debtor has the funds in its pre-petition bank accounts necessary to make the wage and benefit payments requested herein.

**D.     Motion for Entry of an Order (A) Authorizing the Debtor to Continue to Maintain Insurance Policies and Programs and Honor all Associated Obligations and (B) Approving Related Relief (the "*Insurance Motion*")**

60.     By the Insurance Motion, the Debtor seeks authority to continue to maintain its insurance policies, including paying all associated pre-petition amounts.

61.     In connection with the operation of the Debtor's business, the Debtor maintains various insurance policies and a workers' compensation program (collectively, the "*Insurance Policies and Programs*"; and all premiums and other obligations related thereto, including any fees, collectively, the "*Insurance Obligations*") through several different insurance carriers (the "*Insurers*") as. My general understanding is that the Insurance Policies and Programs, and the associated Insurance Obligations, are as follows:

| Type | Annual Premium |
|------|----------------|
| Automotive | $6,755 |
| Business – Liability & Property | $6,493 |
| Liquor Liability | $3,108 |
| Umbrella | $1,225 |
| Workers Compensation | $5,554 |
| **Total** | **$23,135** |

62.     As indicated above, the Insurance Policies and Programs provide the Debtor with insurance related to, among other things, general liability, business personal property coverage, automotive liability, worker's compensation coverage, umbrella liability, and liquor liability. The Debtor maintains the Insurance Policies and Programs to help manage and limit the various risks associated with operating its business, and some of the policies are legally required. I believe that all are essential to the preservation of the value of the Debtor's business.

63.     The Insurance Obligations are primarily comprised of the annual premiums for the Insurance Policies & Programs, which the Debtor pays based upon a fixed rate established and billed by each Insurer.  The Debtor pays approximately $23,135 in Insurance Obligations each year (*see* Exhibit A). For most or all of these, the entire premium is billed, but either the provider or a third-party financing company allows the Debtor to pay in installments.

64.     As part of the Insurance Policies and Programs, the Debtor maintains workers' compensation insurance (the "*Workers' Compensation Program*").   The Debtor's Workers' Compensation Program provides coverage up to $1,000,000.00 per claim.  As of the Petition Date, I am not aware of any pending claims under the Workers' Compensation Program.

65.     I believe that maintaining the Insurance Policies and Programs and paying for the Insurance Obligations are necessary for preserving the Debtor's business. For example, I generally understand that the Debtor' failure to maintain the Workers' Compensation Program could jeopardize coverage and expose the Debtor to fines and other adverse actions by state workers' compensation boards. In addition, the risk that eligible workers' compensation claimants would not receive timely payments for prepetition employment-related injuries could negatively impact the financial well-being and morale of not just those claimants, but also the Debtor's active employees. Similarly, in my opinion the other Insurance Programs and Policies are essential to the Debtor's operations, as the Debtor would be exposed to significant liability if the Insurance Policies and Programs were allowed to lapse or terminate. Such exposure could have a materially adverse impact on the Debtor's strategy and its ability to maximize value for its creditors.

66.     Accordingly, I believe that authority to maintain the Insurance Policies and Programs and to pay all Insurance Obligations, including any unpaid Insurance Obligations arising prior to the commencement of this Chapter 11 Case, is critical to the Debtor's ability to preserve

the going-concern value of its business, which will inure to the benefit of all parties in interest. Hence I believe the request is a sound exercise of the Debtor's business judgment.

67.    I believe and expect that the Debtor has or will have sufficient funds to pay the Insurance Obligations in the ordinary course of business by virtue of existing cash and / or expected cash flows from ongoing business operations.

**E.     Motion for Entry of an Order (A) Authorizing Payment of Prepetition Taxes and Feed and (B) Authorizing Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Presented for Payment Related Thereto**

68.    In the ordinary course of business, the Debtor: (a) collects and incurs taxes in the United States, including Sales and Use Taxes, Federal and State Excise Taxes, Income Taxes, and other taxes (as each is defined herein, and, collectively, the "*Taxes*"); (b) incur fees, assessments, and other similar charges necessary to operate its businesses, including Business License Fees and Other Fees (as each is defined herein, and, collectively, the "*Fees*"); and (c) remits such Taxes and Fees to various taxing, licensing, regulatory, and other authorities (collectively, the "*Taxing Authorities*").

69.    The Debtor pays or remits, as applicable, Taxes and Fees daily, weekly, monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, as required by applicable laws and regulations. The Debtor's failure to remit required Taxes and Fees would undoubtedly jeopardize its operations.

70.    **Sales and Use Taxes:** The Debtor incurs and collects from customers state and local sales taxes (the "*Sales Taxes*") in connection with the sale of products. Sales Taxes are charged at the point of purchase and set by the applicable Taxing Authority as a percentage of the total purchase price.

71.    In addition to Sales Taxes, I understand that the Debtor is also responsible for remitting use taxes (the "*Use Taxes*," and together with the Sales Taxes, the "*Sales and Use*

*Taxes*") any time it purchases tangible personal property from vendors who are not located in the state the property is to be delivered, or on account of certain goods and services. Use Taxes arise if a supplier does not have business operations in the state in which it is supplying goods and therefore does not charge state taxes. In such instances, applicable law generally requires the Debtor to self-assess and pay Use Taxes to the applicable Taxing Authorities.

72.     Additionally, from time to time, the Debtor may receive tax credits for overpayments or refunds of Sales and Use Taxes. It is Debtor's standard practice to use these tax creditors in the ordinary course to offset against Sales and Use Taxes. The Debtor seeks authority to continue using such tax credits in the ordinary course.

73.     As of the Petition Date, the Debtor believes it is current with respect to its payment of Sales and Use Taxes. However, out of an abundance of caution, the Debtor seek authority to pay any outstanding Sales and Use Taxes due as of the Petition Date and continue to pay Sales and Use Taxes on a post-petition basis in the ordinary course.

74.     **Income Taxes:** The Debtor is required to pay, on an annual basis, income or corporate taxes (the "*Income Taxes*") on net income.

75.     As of the Petition Date, I do not believe that any Income Taxes are due and payable and I am not aware of any Income Taxes are expected to become payable within the first 21 days of these Chapter 11 Cases. However, out of an abundance of caution, the Debtor seeks authority to pay any Income Taxes due as of the Petition Date and that become due and payable post-petition in the ordinary course of business.

76.     **Federal and State Excise Taxes:** To my understanding, excise taxes are Federal and state taxes that breweries and other alcohol producers pay on the production and sale of alcoholic beverages, including beer ("*Federal and State Excise Taxes*").

77.     As of the Petition Date, I believe that the Debtor was current on payment of Federal and State Excise Taxes.

78.     **Business License Fees and Other Fees:** As a brewery, the Debtor is subject to substantial licensing requirements. Governmental regulatory entities, including the City of Chicago, Cook County, State of Illinois, and Federal Government, have various licensing requirements that are applicable to the Debtor's business. To maintain its licenses, the Debtor is required to pay corresponding business license fees, annual corporate filing, and similar fees ("*Fees*"). As of the Petition Date, I believe that the Debtor was current on such licensing costs and obligations.

79.     If the Debtor fails to pay the Fees, I believe that the respective licensing agencies may revoke or restrict the Debtor's right to do business, thereby effectively forcing the Debtor to close or severely restrict its operations. In my opinion, the amount of revenue that could be lost during a short shutdown far outweighs the amount of the Fees that might be owing as of the Petition Date.

80.     I believe that the failure to pay the Taxes and Fees could trigger a material adverse impact on the Debtor's operations, including the potential suspension of the Debtor's ability to operate. I further think that withholding payment of the Taxes and Fees very likely would cause Taxing Authorities to take precipitous action, including perhaps an increase in tax audits, additional lien filings, and significant administrative activity.  To the contrary, I believe that prompt and regular payment of the Taxes and Fees will avoid this unnecessary governmental action.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

81.     I look forward to working with all parties to maximize value.

Date:  October 3, 2023

*Tracy Hurst*

Tracy Hurst
President, Metropolitan Brewing, LLC